**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TERRELLE PRYOR, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION aka NCAA; LEARFIELD COMMUNICATIONS, LLC fka IMG COLLEGE; THE OHIO STATE UNIVERSITY; and THE BIG 10 CONFERENCE, INC.<br><br>Defendants. | CIVIL ACTION NO.: _____ |

NOW COMES the Plaintiff, Terrelle Pryor, on behalf of himself and all others similarly situated, and for his Complaint against the Defendants, National Collegiate Athletic Association, Learfield Communications, LLC, The Ohio State University, and The Big Ten Conference, Inc., state and aver as follows:

**INTRODUCTION**

1. It cannot reasonably be denied that college sports is big business.

2. The big business of college sports has translated into billions of dollars in television deals, millions of dollars in the salaries of coaches, and millions of dollars in sponsorship and endorsement deals.

3. Purposefully excluded from this waterfall of money for many years are the people playing the sports and creating the product that makes the money.

4. The student athletes that work so hard to compete at the highest levels and without whose athleticism the big business would cease to exist were, until recently, excluded

from the revenue stream they created by the very rules of the NCAA and its members and co-conspirators.

5. While the NCAA claims that these rules exist to promote amateurism, it has in fact created an anticompetitive market where student athletes are powerless to capitalize on their own names, images, and likenesses (hereinafter referred to as "NIL").

6. While depriving the student athletes of property that is undeniably their own, the NCAA allows large corporate interests to pour money into the big business of college sports and derive huge economic benefits by associating themselves with the student athletes and their athletic achievements through sponsorship and endorsement deals with the NCAA, athletic conferences like The Big Ten Conference, Inc., and schools like The Ohio State University.

7. For many years and continuing to the present, the Defendants have systematically and intentionally misappropriated the publicity rights and NIL of the Plaintiffs and those similarly situated and in doing so have reaped millions, and perhaps billions, of dollars from the Plaintiffs and the class.

8. Meanwhile, the student-athletes themselves were not only prevented from capitalizing on their publicity rights, but they were punished for doing so through the rules the NCAA forced upon them in order for them to participate.

9. The United States Supreme Court has recognized the buyer side monopoly power the NCAA has in the market for the services of the student-athletes, and the fact that its restraints can and do harm competition. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 90 (2021).

10. The Defendants have used and continue to use their monopoly power to exploit the Plaintiffs and the class both during and after their college athletic careers by fixing the amount they may be paid for their NIL at zero.

11. Although the Plaintiff is no longer a student athlete, the Defendants in this case continue to derive revenue from their NIL.  For example, NCAA hosts videos on its own website as well as on YouTube that depict the Plaintiff and the class, and which can only be viewed after watching a commercial advertisement from which the NCAA profits.  The Big Ten Conference, Inc. has a joint venture with Fox Corporation that regularly replays games from the past and which generates substantial advertising revenue.

12. Replays of historic moments from the past are a large part of the Defendants' promotional activities as well as their income streams, and former players have never been compensated for this continuing use of their names, images, and likenesses.

13. Revenue from the use of the NIL of the Plaintiff and the class also results in substantial revenue to the Defendants through the sale of merchandise and memorabilia licensed for sale by NCAA through the Defendant, Learfield Communications, LLC, and/or licensed by the Defendants, The Ohio State University and/or The Big Ten Conference, Inc. as well as revenue from social media uses.

14. Under the NCAA's rules, the Defendants can and do profit from the value of the NIL and athletic achievements of the Plaintiff and the class, even long after their college careers have ended, while providing absolutely no compensation for the same.

15. The Defendants controlled the collegiate sports market, and particularly, the market in which the Plaintiff and the class participated, including licensing rights for players' names and likenesses, game footage, team logos, and trademarks, all of which were used and continue to be used in a range of products, including streaming game films, stock footage, imagery for commercial or editorial use, replay of classic games, posters, photographs, and other merchandise.

16. Throughout the college careers of the Plaintiff and the class, the Defendants and their co-conspirators engaged in fraudulent concealment of their misuse of the publicity rights of the Plaintiffs and the class under the guise of rules they claimed benefited student-athletes, preserved purported amateurism, and protected the integrity of college sports – all in order to maximize their profits at the expense of Plaintiff and the class.

**FACTS**

17. The Defendants illegally agreed to utilize their monopoly power to deprive the Plaintiff and the class of their rights to their names, images, and likenesses, and have continued to assert a perpetual license over those rights continuing into the present day.

18. Throughout their college careers, the Plaintiff and the class were prohibited from endorsing any commercial product, even in the absence of compensation, and were further prohibited from obtaining any monetary benefit from the notoriety derived from their athletic endeavors.

19. At the time the Plaintiff and the class played college sports, the Defendants required them not only to cede control of their publicity rights to them in perpetuity, but also to police the use of their names, images, and likenesses by other parties or else forfeit their right to compete.

20. Meanwhile, the Defendants required the Plaintiff and the class to participate in the promotion of the college sports product through the use of their names, images, and likenesses in advertising and interaction with sports donors and the media while they reaped all of the benefits from the promotion.

21. NCAA has had and continues to have complete control over the labor market for Division I college athletes and has defined itself as the paramount level of competition in college

4

sports. As a result, there are no reasonable substitutes for the educational and athletic opportunities offered by Division I schools, and the NCAA controls virtually all college sports.

22. The NCAA and its co-conspirators, including, but not limited to, the other Defendants named herein, have utilized the disparity in bargaining power they have to coerce student-athletes to give up their publicity rights not only while they are college athletes, but also well beyond the end of their college careers.

23. Former players have never been compensated for the continuing use of their names, images, and likenesses, all to the clear commercial advantage of the Defendants who have made billions of dollars from the efforts of the Plaintiff and the class.

24. The Defendants and their co-conspirators engaged in a contract, combination, and conspiracy consisting of horizontal and vertical agreements that artificially depressed the prices in the market for the labor of student-athletes and fixed those prices at or near zero.

25. The actions of the Defendants, which are ongoing to the present day, constitute an unreasonable restraint of trade that eliminated competition in the market for the publicity rights of student athletes, and unreasonably restrained trade.

26. The resulting harm to the Plaintiff and the class is obvious in that they have been deprived, and continue to be deprived, of the compensation they would receive in an open market.

27. Meanwhile, the Defendants have made millions, if not billions, of dollars.

## PARTIES AND JURISDICTION

### Plaintiff

28. Terrelle Pryor is a citizen and resident of Pennsylvania.

29. In 2008, Terrelle Pryor was widely regarded as the nation's top football prospect. On March 19, 2008, committed to play at The Ohio State University. He was the starting quarterback for the Ohio State Buckeyes from 2008 to 2010. He was Big Ten Freshman of the Year in 2008, led the team to a Big Ten Championship in 2009. In 2010, after winning the MVP of the Rose Bowl, the Defendant, NCAA ruled that Terrelle Pryor would be suspended for five games in the 2011 season for selling memorabilia. Following the sanction, Terrelle Pryor left Ohio State to pursue a professional football career.

30. During his college career, the Plaintiff, Terrelle Pryor, was arguably the most recognizable name in college football, and under the current rules, Plaintiff would have been one of the highest paid collegiate athletes in the country.

31. During his college career, and continuing to the present, the Defendants exploited the Plaintiff's fame and athletic achievements to their benefit and at the expense of the Plaintiff.

**Defendants**

32. The Defendant, NCAA, is an unincorporated association with more than 1,100 member schools, conferences, and other organizations across the United States.

33. The NCAA has member schools and a member conference based in Ohio and is accordingly a citizen of Ohio.

34. The Defendant, Learfield Communications, LLC is the survivor of a merger with IMG College, a former division of IMG Worldwide.

35. Learfield Communications, LLC itself and through its successors has been the exclusive partner of the Defendant, The Ohio State University, in regard to all multimedia rights.

36. In 2009, IMG College, Defendant, Learfield Communications, LLC's predecessor, signed the largest athletics multimedia rights guarantee in collegiate sports history with the Defendant, The Ohio State University, valued at $128 million.

37. Long term multi-media rights contracts between the Defendants, Learfield Communications, LLC, and The Ohio State University, were again announced in December 2020.

38. Under the contracts with The Ohio State University, Learfield Communications, LLC, and its predecessors managed and marketed all rights associated with publishing, radio game play-by-play and coaches' shows, and live and delayed television and coaches' television shows excluded from Big Ten Conference/NCAA contracts. The agreements also included corporate sponsorships, signage, on-site marketing opportunities, and coaches' endorsements.

39. Defendant, The Ohio State University, was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

40. The Ohio State University receives, and at all relevant times received, federal financial assistance, and therefore, is subject to jurisdiction in this Court and liability under the federal statutes cited herein.

41. The Big Ten Conference, Inc. is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located in Rosemont, Illinois.

42. The Big Ten Conference, Inc. is a multi-sport college athletics conference, and a formal conference member of the Defendant, NCAA's Division I, and the Defendant, The Ohio State University, is a member of The Big Ten Conference.

43. The Defendants all participated in the collusive restraint of trade and other violations of law alleged in this Complaint and have damaged and continue to damage the Plaintiff and the class he seeks to represent.

## Unnamed Co-Conspirators

44. Various other persons, firms, corporations, organizations and other entities, known and unknown, have participated as unnamed co-conspirators in the violations alleged in the Complaint, including the NCAA's member schools and Division I athletic conferences, by licensing NCAA footage and images of the Plaintiffs; creating archival footage of the Plaintiffs; and offering footage and images for sale or license to the relevant market, nationwide, including citizens and residents of Ohio.

45. The NCAA has used various companies to manage its licensing activities. All of those companies are not known.

46. Images and collections of images from NCAA competitions, including football contests have been preserved. The entities preserving said images are not all known, but the same have contributed to the allegations in this Complaint.

## Jurisdiction and Venue

47. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1337, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §15 and 15 U.S.C. §26.

48. The Court also has jurisdiction over this matter under 28 U.S.C. §1332(d) because this is a class action in which the amount in controversy exceeds the sum of $5,000,000.00, and in which some members of the proposed class are citizens of states that differ from the citizenship of the Defendants.

49. Venue is proper pursuant to 28 U.S.C. §1391(b) and (c) as well as 15 U.S.C. §§ 15 and 12 because the Defendants reside, are found, have agents, and transact business in this District.

50. This Court has personal jurisdiction over the Defendants because: a) they transacted business in this District; b) they participated in organizing intercollegiate athletics contests and licensed and sold merchandise in this District; c) they had and have substantial contacts in this District; and d) they were engaged in an anticompetitive conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

51. The Defendant, NCAA, has 13 Division 1 schools located in the State of Ohio, many of which are located within this District.

## CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action pursuant to Rule 23(b)(2) on his own behalf and on behalf of the following class:

The Declaratory and Injunctive Relief Class

> All former student-athletes who competed on an Ohio State athletic team at any time prior to the changes to the name, image, and likeness rules of the NCAA.

> This class excludes the officers, directors, and employees of the Defendants as well as all judicial officers presiding over this action and their immediate family members and staff and any juror assigned to this action.

53. On behalf of the Declaratory and Injunctive Relief Class, Plaintiff seeks a declaration that the continued use of the publicity rights, including the names, images, and likenesses of the Plaintiff and the class is unlawful, and an injunction preventing the Defendants from further use of the same without permission and adequate compensation.

54. Plaintiff also brings this action under Federal Rule of Civil Procedure 23(b)(3) on his own behalf and on behalf of the following sub-class:

> The Group Licensing Damages Sub-Class
>
> All former student athletes who competed on an Ohio State athletic team at any time prior to the changes to the name, image, and likeness rules of the NCAA.
>
> This class excludes the officers, directors, and employees of the Defendants as well as all judicial officers presiding over this action and their immediate family members and staff and any juror assigned to this action.

55. On behalf of the members of the Group Licensing Damages Sub-Class, Plaintiff seeks the share of game telecast group licensing revenue that members of this Sub-Class would have received absent the Defendants' unlawful conduct.

56. Plaintiff also brings this action under Federal Rule of Civil Procedure 23(b)(3) on his own behalf and on behalf of the following Sub-Class:

> The Social Media Damages Sub-Class
>
> All former student athletes who competed on an Ohio State athletic team at any time prior to the changes to the name, image, and likeness rules of the NCAA.
>
> This class excludes the officers, directors, and employees of the Defendants as well as all judicial officers presiding over this action and their immediate family members and staff and any juror assigned to this action.

57. On behalf of the members of the Social Media Damages Sub-Class, Plaintiff seeks the social media earnings that members of this Sub-Class would have received absent the Defendants' unlawful conduct.

58. In addition to seeking certification of classes for his antitrust claims, Plaintiff also seeks certification of a class for purposes of their unjust enrichment claims.

59. The members of the Classes are so numerous that joinder of all members is impracticable, and while the exact number of class members is currently unknown, upon information and belief there are thousands of members of the Classes.

60. The claims of the Plaintiff are typical of the claims of other members of the Classes. Plaintiff and the members Classes sustained damages arising out of the Defendants' common course of illegal conduct as described herein, and their injuries and damages were directly and proximately caused by Defendants' conduct.

61. Plaintiff will fairly and adequately protect the interests of the members of the Classes and has retained competent and experienced class action counsel versed in antitrust class action litigation.

62. Common questions of law and fact predominate as to all the members of the Classes over any questions solely affecting individual members of the Classes.

63. The common questions of law and fact common to the Classes are:

   a. Whether the Defendants engaged in a contract, combination, and/or conspiracy to illegally restrain trade by fixing the compensation available to members of the Classes for their names, images, and likenesses at zero;

   b. Whether the Defendants' conduct caused members of the Classes to receive less compensation for their publicity rights and names, images, and likenesses than they would have received but for the conduct and elimination of a competitive market;

   c. Whether the Defendants violated the Sherman Act;

   d. Whether the Defendants' conduct caused injury to the Plaintiffs and the members of the Classes; and

  e. Whether the Class is entitled to injunctive relief, and if so, the nature and extent of the injunctive relief.

64. Additional common questions of law and fact specific to the Sub-Classes predominate as to all the members of the Sub-Classes over any questions solely affecting individual members of the Sub-Classes.

65. The additional common questions of law and fact specific to the Sub-Classes are:

  a. The measure of damages sustained by the Plaintiff and the members of the Sub-Classes; and

  b. Whether and to what extent the Defendants have been unjustly enriched.

66. Plaintiff's claims are typical of the Classes because the Defendants' conduct in restraint of trade has injured both the Plaintiff and the members of the Classes.

67. Plaintiff is an appropriate and adequate representative of the Classes, will protect the claims and interests of the Classes, and has no interests that conflict with those of the Classes.

68. Plaintiff will vigorously prosecute the claims alleged herein.

69. A class action is superior to any other method for the fair and efficient adjudication of the controversy at issue. A class action presents fewer management difficulties, provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court.

70. The damages sustained by the Plaintiff and each member of the Classes is small as compared to the expense and burden of individual adjudication of the claims asserted herein.

71. In the absence of class certification, it would not be feasible for the Plaintiff and the members of the Classes to obtain compensation for the wrongs done to them.

72. Judicial economy is also promoted by a class certification because the Court will be relieved of large numbers of individual cases, and the risk of inconsistent or contradictory rulings is mitigated.

## COUNT I
## Violation of Section 1 of the Sherman Act

73. Plaintiff hereby incorporates by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

74. Defendants and their co-conspirators have entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant market to illegally and artificially fix, depress, and/or maintain the prices paid for the publicity rights, including name, image, and likeness rights, of the members of the Classes at zero dollars when a relevant free market would pay the Plaintiffs and the class members significantly more.

75. The Defendants and their co-conspirators' illegal conduct deprived and continues to deprive the Plaintiff and the members of the Classes of any compensation for the use of their names, images, and likenesses, raised the prices charged by the Defendants for licensing rights, and has artificially limited supply and depressed compensation to the Plaintiff and the members of the Classes.

76. The Defendants and their co-conspirators' conduct has no legitimate procompetitive purpose, and no other legitimate or legal purpose.

77. The Defendants and their co-conspirators' conduct is in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

78. As a direct and proximate result of the Defendants and their co-conspirators' conduct, the Plaintiff and the members of the Classes have been and continue to be damaged financially.

13

79. Pursuant to Section 4 of the Clayton Act, the Plaintiff and the members of the Classes are entitled to recover treble damages, attorneys' fees, and costs.

80. Plaintiff and the members of the Class are also entitled to and request a permanent injunction preventing the Defendants from engaging in the same or similar conduct in the future.

## COUNT II
## Violation of Section 1 of the Sherman Act

81. Plaintiff hereby incorporates by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

82. Defendants and their co-conspirators have entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant market to effectuate a group boycott and refusal to deal with the Plaintiffs and the members of the Classes in regard to compensation for their names, images, and likenesses, and thereby to refuse to permit compensation to be paid to the members of the Classes.

83. Defendants and their co-conspirators have used their power over the Plaintiffs and members of the Classes to require them to forever relinquish their control over their names, images, and likenesses in perpetuity in exchange for the ability to participate in college athletics, thereby foreclosing them from the market.

84. The Defendants and their co-conspirators' group boycott and refusal to deal includes ongoing concerted action to deny Class Members any compensation or royalties for the continued use of the names, images, and likenesses for profit.

85. The Defendants and their co-conspirators' conduct is in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

86. As a direct and proximate result of the Defendants and their co-conspirators' conduct, the Plaintiff and the members of the Classes have been and continue to be damaged financially.

87. Pursuant to Section 4 of the Clayton Act, the Plaintiff and the members of the Classes are entitled to recover treble damages, attorneys' fees, and costs.

88. Plaintiff and the members of the Class are also entitled to and request a permanent injunction preventing the Defendants from engaging in the same or similar conduct in the future.

### COUNT III
### Unjust Enrichment

89. Plaintiff hereby incorporates by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

90. At all times relevant herein, the Plaintiff and the Class Members expended substantial labor and efforts in the pursuit of their collegiate athletic careers, which added substantial value to their names, images, and likenesses.

91. Through their conduct as alleged herein, the Defendants and their co-conspirators misappropriated the names, images, and likenesses of the Plaintiff and the Class Members.

92. The labor and efforts expended by the Plaintiff and the Class Members resulted in increased revenue for the Defendants, and at all times relevant herein, the Defendants and their co-conspirators were aware of the benefits being conferred upon them by the Plaintiff and members of the Classes.

93. Retention of the benefits by the Defendants and their co-conspirators without payment to the Plaintiff and the class members would be unjust and unconscionable under the circumstances.

94. Defendants and their co-conspirators should be required to disgorge all of their illegal profits resulting from the wrongful conduct described herein, and a constructive trust should be established to allow the Plaintiff and the members of the Class to seek restitution.

WHEREFORE, the Plaintiff, Terrelle Pryor, on behalf of himself and all others similarly situated, respectfully requests the following relief:

1. Certification of this action to proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and direct that reasonable notice be provided to the Classes;

2. Entry of a temporary and permanent injunction preventing the Defendants from continuing in their present course of conduct in regard to the misappropriation of the names, images, and likenesses of the Plaintiff and the members of the Classes;

3. Damages according to the proof at trial and treble damages pursuant to 15 U.S.C. §15;

4. Attorneys' fees, costs, and expenses; and

5. Such other and further relief as the Court deems just and proper.

By: /s/ *Kevin M. Pearl*
               Counsel

Michael G. Simon, Esq. (OH I.D. #0067520)
Kevin M. Pearl, Esq. (OH I.D. #0074772)
FRANKOVITCH, ANETAKIS, SIMON,
DECAPIO & PEARL, LLP
337 Penco Road
Weirton, WV 26062
(304) 723-4400 (p)
(304) 723-5892 (f)
msimon@faslaw.com
kevin@faslaw.com

Michael J. Shaheen, Esq. (OH I.D. #0042155) (will seek admission *pro hac vice*)
Diane G. Senakievich, Esq. (OH I.D. #0088558)
SHAHEEN LAW GROUP, LLC
150 West Main Street, Suite 1
P.O. Box 579
St. Clairsville, OH 43950
(740) 695-4448 (p)
(740) 695-6511 (f)
michael@slgjustice.com
diane@slgjustice.com